708 S.E.2d 237

William James **BIGGINS**, Appellant,

v.

Karen Lee **BURDETTE**, f/k/a Karen Burdette Biggins, Respondent.

No. 4808.

Court of Appeals of South Carolina.

Submitted Nov. 1, 2010.

Decided March 16, 2011.

Rehearing Denied April 21, 2011.

Charles D. Lee, III, of Columbia, for Appellant.

Victoria L. Eslinger and Russell T. Burke, both of Columbia, for Respondent.

KONDUROS, J.

William James Biggins filed this action seeking to terminate alimony payments to his ex-wife, Karen Lee Burdette, based on Burdette's relationship with a paramour. The family court denied Biggins motion to terminate and awarded Burdette attorney's fees of approximately $126,000. We affirm.[1]

## FACTS

Biggins and Burdette were divorced in December 2004 after a twenty-seven-year marriage on the grounds of Husband's adultery. Burdette admittedly began having a sexual relation-

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

ship with a man (Boyfriend) in June of 2005. According to Burdette's testimony, she kept her relationship with Boyfriend a secret because she did not want an elderly aunt who lived in the same neighborhood or her daughter to be aware of her and Boyfriend's spending the night together. Generally, Burdette picked Boyfriend up in her vehicle, brought him to her home, and returned him to his residence the following morning if they spent the night together. Burdette and Boyfriend testified they spent approximately sixty nights together during their relationship which ended in September of the same year. Burdette testified regarding several occasions she and Boyfriend spent the night apart including a time when her son and his family came to visit, when she went out of town to care for her ailing mother, when her aunt came to visit, when her daughter visited, and when her former mother-in-law came to visit. Burdette and Boyfriend testified they did not reside together. According to Burdette and Boyfriend, with the exception of a few toiletries and items of clothing, Boyfriend did not keep his belongings at her home, and he only had a substantial amount of clothing at her home on the few occasions he did laundry there.

The deposition testimony of Boyfriend's roommate, Danny McCaskill, was admitted at trial over Burdette's hearsay objection. Casting some doubt on the veracity of Burdette's and Boyfriend's testimonies, McCaskill testified to coming home and finding Boyfriend's "clothes and luggage and things of that nature" on the couch. McCaskill asked Boyfriend if "Karen [Burdette] kicked [him] out" and Boyfriend responded she didn't want his belongings at her house when she had guests visiting.

Biggins had Burdette followed by three private investigators. Paul Blackburn testified he conducted surveillance on Burdette and Boyfriend on twelve occasions from June 7, 2005 through August 24, 2005. He observed Boyfriend leaving Burdette's home on the morning of June 14 and observed Boyfriend and Burdette leave her residence together in the morning four other times. David Vinson testified he observed Burdette and Boyfriend on seventeen occasions and saw them together leaving her home seven times. Brian Stillinger testified he conducted surveillance on Burdette's home twenty-six times and observed her and Boyfriend together in the morning nine times.

The family court determined Boyfriend and Burdette did not continually cohabitate as contemplated by section 20–3–130 of the South Carolina Code. The family court noted the pair spent no more than sixty to seventy-two nights together, although they may have been in a relationship for more than ninety days, and those nights were not consecutive. The family court also noted Boyfriend maintained his own residence during the relationship and did not receive mail at Burdette's home or use that as his address. The family court concluded the pair had not continually cohabitated and separated only to circumvent the statute but had lived apart and met for romantic rendezvous. The family court awarded Burdette attorney's fees in the amount of $126,797.30. This appeal followed.

## LAW/ANALYSIS

### I. Continued Cohabitation

■ Biggins argues the family court erred in finding Burdette and Boyfriend did not continually cohabitate so as to warrant termination of alimony. We disagree.

■ Payment of permanent, periodic alimony by a payor spouse will terminate "upon the remarriage or continued cohabitation of the supported spouse...." S.C.Code Ann. § 20–3–150 (Supp.2010). According to statute, continued cohabitation occurs when "the supported spouse resides with another person in a romantic relationship for a period of ninety or more consecutive days." S.C.Code Ann. § 20–3–150(B). The family court can terminate alimony if it determines the supported spouse was cohabitating with someone in a romantic relationship for less than ninety days if the pair separated periodically for purposes of circumventing the ninety-day requirement. *Id.*

The South Carolina Supreme Court discussed and defined "continued cohabitation" in *Strickland v. Strickland*, 375 S.C. 76, 650 S.E.2d 465 (2007). "We find that the phrase 'resides with' in the context of [section] 20–3–150 sets forth a requirement that the supported spouse live under the same roof as the person with whom they are romantically involved for at least ninety consecutive days. Any other interpretation essentially takes the 'cohabitation' out of 'continued cohabitation.'" *Id.* at 89, 650 S.E.2d at 472.

Since *Strickland*, the South Carolina Supreme Court and Court of Appeals have applied the rationale in *Strickland* in four other cases. In each case, the moving party failed to establish the supported spouse had continually cohabitated with another person as contemplated by the statute. *See Eason v. Eason*, 384 S.C. 473, 482, 682 S.E.2d 804, 808 (2009) (finding no bar to alimony when ex-wife and boyfriend may have resided together for periods of two to four weeks but never for a continuous period of ninety days); *Fiddie v. Fiddie*, 384 S.C. 120, 126, 681 S.E.2d 42, 45 (Ct.App.2009) (holding ex-wife did not continually cohabitate with a man when she lived with him sometimes but also stayed with her sister and friend several days each month so as to not "wear out her welcome"); *Feldman v. Feldman*, 380 S.C. 538, 544, 670 S.E.2d 669, 671–72 (Ct.App.2008) (affirming family court's finding of no continued cohabitation when ex-wife and boyfriend were not observed living together for ninety days and when ex-wife's friends and family testified she lived alone); *Semken v. Semken*, 379 S.C. 71, 77, 664 S.E.2d 493, 497 (Ct.App.2008) (reversing family court's termination of alimony because evidence did not demonstrate ex-wife and boyfriend lived under the same roof for ninety consecutive days).

The evidence in the record supports the family court's decision. The parties admittedly were in a romantic relationship for just over ninety days. However, that alone does not satisfy the statute. According to *Strickland*, the parties must "live together under the same roof." Burdette and Boyfriend testified they did not intend to live together and that they did not spend ninety consecutive nights together. They further testified that Boyfriend maintained his own residence and kept most of his personal items there. The observations of the private investigators do not refute this testimony but merely confirm that Burdette and Boyfriend were spending the night together at Burdette's home on a recurring basis. Whether to believe the parties' testimony is a credibility determination and we defer to the family court's judgment in that regard. *See Terwilliger v. Terwilliger*, 298 S.C. 144, 147, 378 S.E.2d 609, 611 (Ct.App.1989) ("Resolving questions of credibility is a function of the family court judge who heard the testimony.").

Furthermore, even if the parties did reside together for certain periods of time, according to McCaskill's testimony,

Burdette "kicked him out" when she had visitors and he took all his things with him. Under *Eason* and *Fiddie*, no continued cohabitation occurs even if the parties lived together but separated before the ninety days passed for reasons other than to circumvent the statute. The evidence shows the parties separated to protect Burdette's reputation, not to circumvent the statute. Therefore, the family court did not abuse its discretion in denying Biggins's motion to terminate alimony based on continued cohabitation.

## II. Attorney's Fees

■ Biggins further argues the family court erred in awarding attorney's fees to Burdette and in not awarding attorney's fees to him. We disagree.

■ "In family court, the award of attorney's fees is left to the discretion of the judge and will only be disturbed upon a showing of abuse of that discretion." *High v. High*, 389 S.C. 226, 249, 697 S.E.2d 690, 702 (Ct.App.2010).

■ First, Biggins maintains the attorney's fees award to Burdette was in error because the underlying decision regarding the termination of alimony was incorrect. As we have affirmed the family court's determination of that point, this argument is unavailing. Second, Biggins argues the family court failed to make specific findings of fact regarding each of the *Glasscock*[2] factors. However, this issue was not raised to or ruled upon by the trial court and is therefore not preserved for our review. *Smith v. Smith*, 386 S.C. 251, 273, 687 S.E.2d 720, 732 (Ct.App.2009) (stating to preserve an issue for appellate review, it must be raised to and ruled upon by the trial court).

Lastly, Biggins argues the attorney's fees award was excessive and unduly punitive. While Biggins failed to challenge the attorney's fees affidavit presented by Burdette's counsel at

---

**2.** *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991), sets forth the following factors to be considered in determining the amount of attorney's fees to be awarded: (1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) counsel's professional standing; (4) the contingency of compensation; (5) the beneficial results obtained; and (6) the customary legal fees for similar services.

trial, he did raise a general argument in a subsequent Rule 59(e), SCRCP, motion that the amount of attorney's fees was "excessive under the facts and circumstances presented." Because the point is arguably preserved, we will address it. *See Floyd v. Floyd,* 365 S.C. 56, 73, 615 S.E.2d 465, 474 (Ct.App. 2005) (holding appellant failed to preserve issue regarding amount of attorney's fees award when he made no challenge to fee affidavit at hearing *and* did not file a Rule 59(e), SCRCP, motion).

Biggins's argument is not based on a specific challenge to any of the *Glasscock* factors, which the family court considers in awarding fees, but is based on a general theory that Biggins had reason to believe Burdette was cohabitating with Boyfriend and was therefore justified in bringing the action. With no authority to support this argument and because the family court's order demonstrates it considered the *Glasscock* factors and rendered a decision based on an unchallenged attorney's fees affidavit, we discern no abuse of discretion in the family court's award of attorney's fees.

Based on all of the foregoing, the order of the family court is

**AFFIRMED.**

HUFF and LOCKEMY, JJ., concur.